# EXHIBIT

# A

## Martin's Pattern Recognition: Conflict of Interest as Predictive of Systemic Fraud



# EXHIBIT

# B



# EXHIBIT

# C

# DV Supplement-Timeline of Events

## December 2023 - April 2024

1. **Attorney Representation Conflict** (December 11, 2023) Harold Levy confirmed in writing that attorney Yenisey Rodriguez-McCloskey considered representing Nubai in the RICO case but declined due to a "relationship with someone on the other side." She later represented Outbrain against Nubai in the same matter.
2. **Jurisdictional Manipulation** (February 14, 2024) Attorney David Pohl emailed Martin insisting the case must be moved from SDNY federal court to state court, creating a critical jurisdiction shift from RICO to fraud claims.
3. **Co-CEO Strategic Resignation** (February 29, 2024) Yaron Galai, Outbrain Co-CEO and founder, abruptly resigned after 17 years with the company, announced during earnings call, just weeks before Martin's lawsuit.
4. **Conflicted Legal Representation Filing** (April 15, 2024) Outbrain filed motion to dismiss with attorney Yenisey Rodriguez-McCloskey representing them, despite her previously considering representing Nubai—a direct conflict of interest.
5. **First Board Letter Publication** (April 16, 2024) Martin published first open letter to Outbrain Board members documenting fraud and conflicts, establishing public record of board knowledge before further strategic events unfold.

## April 2024 - May 2024

6. **Settlement Information Extraction** (April 23-25, 2024) Harold Levy asked Martin about settlement expectations, then only after obtaining this information revealed he and Rodriguez-McCloskey were "law school classmates and good friends."
7. **Coordination Between Opposing Counsel** (April 24, 2024) Rodriguez-McCloskey emailed Pohl about settlement discussions within hours of Martin's conversation with Levy, demonstrating real-time coordination between supposedly opposing attorneys.
8. **Verification-Traffic Bridge Formation** (April 25, 2024) Mark Zagorski (DoubleVerify CEO) was appointed to Outbrain's Board of Directors, creating a direct connection between verification and traffic companies.
9. **Second Board Letter Publication** (May 3, 2024) Martin published second board letter with additional evidence and directly references "unlucky" factors involved in exposing fraud, prompting immediate reactions from multiple parties.
10. **Strategic Attorney Withdrawal** (May 6, 2024) Attorney David Pohl filed motion to withdraw as counsel immediately after Martin's second board letter revealing conflicts, despite previously indicating continued representation.

# May 2024 - July 2024

11. **Double Process Service Evasion** (May 21-23, 2024) Both attorneys (Pohl and Rodriguez-McCloskey) failed to respond to multiple process service attempts despite prior email notification from Martin.
12. **Judge Communication of Obstruction** (May 24, 2024) Martin emailed NY Supreme Court Judge Rosado with sworn affidavit detailing attorney conflicts, documenting process service evasion by both attorneys despite direct notification.
13. **FBI Engagement with Martin** (June 17, 2024) FBI official called Martin to discuss potential obstruction, surveillance, and hacking concerns.
14. **Fox Rothschild Withdrawal** (July 11, 2024) Fox Rothschild (firm that represented DoubleVerify in litigation) emailed Martin announcing withdrawal as counsel for Nubai on trademark matters despite no active work for 12+ months.
15. **Galai Stock Sales After FBI Contact** (July 15-17, 2024) Yaron Galai initiated significant Outbrain share sales ($110,548 worth) through Rule 10b5-1 trading plan – his first major sales of the year following FBI contact with Martin.

# September 2024 - October 2024

16. **Board Member's Dual Role Resignation** (September 19, 2024) Kate Jhaveri abruptly departs from TikTok position while simultaneously serving on Outbrain board, one day before Martin secured legal representation. Jhaveri is connected to two companies of foreign character including China as potential strategic placement.
17. **Legal Representation and Market Reaction** (September 20, 2024) Martin's new attorney filed Notice of Appearance as Martin's counsel. Outbrain stock immediately declined 5% on 3x average volume, indicating institutional knowledge of significance.
18. **Baupost Exit from Outbrain** (September 23, 2024) Baupost Group exited remaining $118 million Outbrain convertible note position at 7.5% discount, completely divesting from investment made before IPO.
19. **SEC Enforcement Director Resignation** (October 2, 2024) SEC Enforcement Director Gurbir Grewal Departure,followed by Acting Director Sanjay Wadhwa in January 2025.
20. **Federal Investigation Confirmation** (October 11, 2024) Marketing Brew reported DOJ and Naval Criminal Investigative Service (NCIS) were investigating brand safety companies including DoubleVerify.

# October 2024 - February 2025

21. **Junior Attorney Withdrawal** (October 20, 2024) Junior attorney Kaeleen Kosmo suddenly withdrew from helping Martin amend complaint after initially agreeing to the project, continuing pattern of legal representation disruption.
22. **Case Dismissal Without Notice** (January 21, 2025) Judge Mary Rosado dismissed Nubai lawsuit without notice despite "stayed/pending application" status on court website, within hours of executive branch transition.

23. **Senate Bipartisan Letter** (February 7, 2025) Senators Richard Blumenthal and Marsha Blackburn sent letter directly to Mark Zagorski questioning DoubleVerify's URL data concealment practices.
24. **New Zealand Media Coverage** (February 16, 2025) New Zealand publication ran article on "Digital Iron Dome" connecting Outbrain to Israeli military intelligence, first international media coverage.
25. **DoubleVerify Stock Collapse** (February 28, 2025) DoubleVerify stock collapsed 36.03% on 8.2x normal volume following revelations about URL transparency issues.

# EXHIBIT

# D

# EXHIBIT : ZAGORSKI/DV-PROVIDENCE TIMELINE OF EVENTS

## I. PROVIDENCE EQUITY AND DOUBLEVERIFY ACQUISITION (2017-2019)

**August 23, 2017** - Providence Equity Partners acquires majority stake in DoubleVerify for approximately $200 million, valuing the company at "more than $300 million" according to Wall Street Journal reporting.

**September 2017** - Davis Noell (Senior Managing Director at Providence) is appointed Chairman of DoubleVerify's Board of Directors. Laura Desmond (former Publicis Groupe executive) joins DoubleVerify's Board as Providence's representative.

**2017-2019** - DoubleVerify expands operations under Providence Equity ownership, with Wayne Gattinella serving as CEO.

## II. PRYCHODKO DEATH AND DOUBLEVERIFY LEADERSHIP TRANSITION (2018-2020)

**July 10, 2018** - Lara Prychodko, 48, is found dead at the bottom of a trash chute after falling 27 floors at Zeckendorf Towers in Manhattan.

**July 15, 2019** - Former New York City Chief Medical Examiner Michael Baden determines Prychodko "may have died because of homicidal ligature strangulation and was then placed in the garbage chute," noting signs of strangulation and torn clothing suggesting a struggle. Baden notes these findings in a letter to the Prychodko family.

**February 22, 2020** - New York Post publishes article revealing Prychodko had an affair with DoubleVerify CEO Wayne Gattinella prior to her death.

**February 28, 2020** - Wayne Gattinella abruptly steps down as CEO of DoubleVerify "by mutual agreement with DV's Board of Directors." DoubleVerify announces Laura Desmond (Providence's representative) will serve as Interim CEO.

**March 23, 2020** - DoubleVerify signs employment agreement with Andrew Grimmig, appointing him as General Counsel and Chief Legal Officer.

1

**March 30, 2020** - Andrew Grimmig officially begins work at DoubleVerify.

# III. ZAGORSKI'S STRATEGIC PLACEMENT AT DOUBLEVERIFY (2020)

**July 2, 2020** - DoubleVerify announces Mark Zagorski as new CEO. Providence's Davis Noell states: "Mark's industry expertise and experience with both public and private companies will be a tremendous asset to DV as it continues to execute on its growth strategy."

**July 21, 2020** - Mark Zagorski officially begins as DoubleVerify CEO.

# IV. ZAGORSKI-PROVIDENCE RELATIONSHIP HISTORY (2012-2020)

**2012-2015** - Mark Zagorski serves as CEO of eXelate, a data analytics company.

**March 13, 2015** - Viola Group co-founder Shlomo Dovrat (later Outbrain board member) publishes blog post discussing eXelate exit, confirming close working relationship with Zagorski. Dovrat writes: "I have worked closely with Iri, Elad, Mark Zagorski (the current CEO) and the rest of the management team over the years."

**March 2015** - Zagorski leads sale of eXelate to Nielsen, then assumes role of Executive Vice President, launching Nielsen Marketing Cloud.

**2017-2019** - Zagorski serves as CEO of Telaria, a video advertising platform.

**April 2020** - Telaria completes merger with Rubicon Project. Zagorski serves briefly as President and COO of the combined company before departing to join DoubleVerify.

# V. PROVIDENCE-USIS CONNECTION AND GRIMMIG OVERLAP (2011-2020)

**2011-2015** - Providence Equity Partners holds significant investment in Altegrity, parent company of USIS (US Investigations Services), a background check company servicing government contracts.

**2012-2020** - Andrew Grimmig serves as Senior VP, Corporate Development and Chief Counsel at Altegrity, overseeing legal affairs for USIS, Kroll, and HireRight.

**2012-2015** - Davis Noell serves on USIS board during same period Grimmig serves as Chief Counsel, establishing direct working relationship.

**February 2014** - Department of Justice joins whistleblower lawsuit against USIS, alleging the company submitted at least 665,000 incomplete background investigations to the government.

**February 2015** - Altegrity files for bankruptcy following fraud accusations against USIS. Providence Equity has its entire $800 million stake wiped out, described by The New York Times as "the largest loss in the firm's 26-year history."

**April 25, 2015** - Providence Equity founder Jonathan Nelson admits to The New York Times regarding Altegrity: "One of our mistakes was definitely style drift...Altegrity was a good example of that."

# VI. OUTBRAIN-DOUBLEVERIFY STRATEGIC CONNECTION (2024-2025)

**April 24, 2024** - Outbrain discloses in SEC filing that Mark Zagorski has joined its Board of Directors, creating direct connection between company generating traffic (Outbrain) and company verifying traffic quality (DoubleVerify).

**April 25, 2024** - Martin's attorney David Pohl informs him of intent to withdraw within hours of Zagorski's strategic bridge placement at Outbrain.

**May 3, 2024** - Martin publishes second board letter documenting conflicts, directly identifying himself as an "unconventional whistleblower."

**February 7, 2025** - Senators Richard Blumenthal and Marsha Blackburn send bipartisan letter to Zagorski questioning DoubleVerify's URL transparency practices.

**February 27, 2025** - Zagorski announces URL transparency policy change during DoubleVerify earnings call, immediately following Senate inquiry.

**February 28, 2025** - DoubleVerify stock collapses 36% on 8.2x normal volume following revelations about URL transparency issues.

**March 17, 2025** - Demand letter sent to Zagorski, DV General Counsel, and Board Chairman Noell documenting whistleblower retaliation and conspiracy claims.

**March 15-21, 2025** - Three key DV insiders—including Zagorski and Providence representative Laura Desmond—execute stock sales totaling over $900,000 following receipt of demand letter.

**March 28, 2025** - Wall Street Journal publishes article revealing Adalytics investigation into ad verification companies, specifically highlighting DoubleVerify; stock reaches 52-week low.

**March 28, 2025** - Demand letter deadline passes with no response from Zagorski or DoubleVerify.

3

# VII. DOCUMENT SUPPRESSION ACTIVITY (2025)

**March 2025** - DoubleVerify removes all pre-2023 press releases from its website, including the July 2, 2020 announcement of Zagorski's hiring. The URL for this announcement (https://doubleverify.com/doubleverify-names-mark-zagorski-chief-executive-officer/) returns "Page Not Found" error.

**March 16, 2025** - New York State Courts Electronic Filing System applies unprecedented restriction to Nubai Ventures v. Outbrain case: "THIS CASE IS NOT AVAILABLE TO THE PUBLIC ONLINE - CONTACT THE COURT FOR ACCESS."

# EXHIBIT

# E

IN THE NEWS

# Wrongful death lawsuit filed 5 years after Lara Prychodko was found dead at the bottom of a Manhattan trash chute

The 48-year-old's manner of death was listed as "undetermined." Her father is determined to seek answers and get justice for his daughter, who he believes was murdered.



July 10, 2023, 4:59 PM EDT

**By Bradley Davis**

It happened five years ago on July 10, 2018. A New York woman was found dead at the bottom of a luxury Manhattan building's trash chute, and while officials have found no signs of foul play in her death, her distraught family believes she was murdered. And they say that after five years, they are still seeking answers – and justice.

Lara Prychodko, 48, died less than a month after she celebrated her birthday in Paris and on the Spanish island of Ibiza with friends. Her body was found at the bottom of the trash chute after it plummeted from the 27th floor of the Zeckendorf Towers in Union Square, where she was living at the time. "It feels like a made-for-TV movie, it's just surreal," Lara's sister, Talya, told Dateline in a recent interview. We began covering the case in 2020.

Now Lara's father, Nicholas Prychodko, has filed a wrongful death lawsuit alleging that his daughter's ex-husband, David Schlachet, and an unidentified hit man "conspired to and, through their concerted efforts, did, in fact, murder Lara Prychodko." In the suit, Prychodko alleges Schlachet installed software on Lara's computer to track her whereabouts, which enabled the hit man to lie in wait, strangle her to death, then dispose of her body down the building's trash chute. According to the lawsuit, the couple had been going through an "acrimonious divorce." Lara's father claims Schlachet was under "intense financial pressure" and expected to lose millions of dollars to his ex-wife in the divorce settlement.

In a response to the lawsuit filed in June, David Schlachet's attorney denied the allegations, stating that the hit man (identified only as "John Doe" in the lawsuit) is a "wholly fictitious person." Dateline reached out to Schlachet's attorney for additional comment but received no reply.

No criminal charges have ever been filed in Lara Prychodko's death – against Schlachet or anyone else. Her family told Dateline they are hoping the lawsuit will help change that. When the NYPD first investigated her death, they viewed security footage that showed Lara entering the building at 4:10 p.m. on July 10, 2018, and getting on the elevator by herself.

Dateline first interviewed Lara's father in 2020, and he spoke at length about his daughter and the circumstances surrounding her death. In that interview he told us that earlier that summer day in 2018, Lara had gone to a nearby bar to watch France play in the World Cup semi-finals.

"Her grandfather is French and she speaks French," Prychodko said. "So she was a big fan."

France beat Belgium in the semi-finals match that day, and Prychodko said his daughter was overjoyed.

"The doorman said she was happy. She was high-fiving them," Prychodko said. "They all loved her because, you know, she was just so friendly and nice."

A neighbor on the 27th floor later told police that she got home around 4:20 p.m. and noticed nothing amiss in the hallway, which had no security camera, as she walked to her own

apartment. Ten minutes later, the same neighbor said she heard loud noises in the hallway and stepped out to investigate.

She said she didn't see anyone, but saw a purse on the floor outside the trash compactor entrance. Police later identified the purse as belonging to Lara.

Just minutes later, at 4:40 p.m., a maintenance worker checked the trash compactor, which had become jammed. That's when he found Lara's crushed body.

After their investigation, the NYPD determined no criminal activity was involved. Lara had a blood alcohol level of .29 at the time of her death, and the NYC Office of Chief Medical Examiner concluded that "the circumstances around the death are unclear; however there is no suspicion of foul play." The manner of death was listed as "undetermined."

Lara's father, however, refused to believe her death was a drunken mistake and maintains his feeling that she was murdered, as he and his attorneys now outline in the lawsuit.

"What could have happened to her?" Prychodko asked. "Was it a suicide? It's not possible. That's not Lara. Was it an accident? I very quickly became convinced that there was only one plausible explanation for what took place. And that's homicide."

He explained that the trash chute at Zeckendorf Towers was about 15'' by 18'' with a door, and that his daughter was 5'10," tall, which he believed would make it impossible for her to just fall in or even attempt suicide.

In 2019, Prychodko sought help from former New York City Chief Medical Examiner Michael Baden. Baden made headlines after concluding that Jeffrey Epstein's injuries were "more indicative" of homicide than the suicide determination made in the official autopsy report.

Dateline viewed a letter that Baden sent to the Prychodko family after he had reviewed autopsy notes, lab tests, crime scene photos and x-rays.

In the July 15, 2019 report, Baden determined that Lara Prychodko "may have died because of homicidal ligature strangulation and was then placed in the garbage chute."

The report also stated that the strangulation "may also explain why there was little bleeding from the lacerated viscera and torn blood vessels noted at autopsy."

Nicholas Prychodko told Dateline that Baden also mentioned a photo from the scene that showed Lara without her shirt.

"Lara's blouse is torn from her body," Prychodko said. "And that to him is an indication that there could have been a struggle against the assailant."

Lara's father submitted Baden's findings to the New York County District Attorney's Office and the NYC Office of the Medical Examiner and requested that her case be reopened.

Despite Baden's findings, the city's Office of the Chief Medical Examiner told Prychodko in a letter viewed by Dateline, that the medical examiner "found no signs of foul play in your daughter's death," and has determined to stand by its earlier findings and not reopen the investigation.

Lara's father told Dateline that before her death, he was aware of that "acrimonious divorce" described in the lawsuit. Lara's estranged husband, Schlachet, owns a Manhattan construction company. Lara's father said the couple fought over millions of dollars in assets, including a home in the Hamptons and two apartments in Manhattan.

They have a son together, who is now 17 years old. Lara had lost custody of her son because of a DUI charge, her father said. He added that before her death, Lara had been granted visitation rights and was scheduled to see her son the day after she died.

In an email sent to Dateline in 2020, Schlachet stated "I can only say that my divorce -- like so many -- was a painful and sad experience to go through with someone I had loved so deeply. But that does not diminish the grief and trauma our son and I have experienced by the tragic loss of our wife and mother, Lara. It is a pain that we are both still learning to cope with and which we will both carry with us forever."

As he reflected on the tragedy of Lara's death, her father also recalled the impact she had on so many people.

"She shaped both the beginning of my formative adult life and now she's shaping how I spend the last years of my life," he said. "She has made a tremendous impact in my life, and also in so many other lives through the course of her own, all-too-short life."

Lara grew up in Toronto, Canada where she attended the Etobicoke School for the Arts and then went on to the University of Toronto. Her father said she was very protective of her younger siblings.

"Although you can imagine that she could also be a little bit bossy at times," Prychodko said, laughing. "She had this happy childhood. I remember spending summers at the lake -- renting cottages by the lake going fishing, canoeing, swimming."

3/31/25, 12:32 PM
Case 1:25-cv-02715-LJL   Document 1-1   Filed 03/31/25   Page 19 of 66
Wrongful death lawsuit filed 5 years after Lara Prychodko was found dead at the bottom of Manhattan trash chute

Right after college, Lara moved to New York City and eventually became an event organizer. She worked with corporate organizations, including WebMD, where she met CEO Wayne Gattinella, whom she was dating at the time of her death, according to her friends and family.

"Lara was extremely sociable," her father said. "She had great interpersonal skills and networking skills, which is what helped to make her so successful."

Lara's sister, Talya, who still lives in Toronto, told Dateline the two were extremely close.

"She was my best friend," Talya said. "She was kind and generous and found the good in everyone. She was a beautiful soul."

If Lara were still alive, she would have turned 53 on June 23. Talya told Dateline she has connected Lara's friends from all over the world to share stories of Lara and to celebrate her life.

"She touched so many people's lives during her time here," Talya said. "She was a social person and she strived to surround herself with people of influence, not affluence."

Talya said she last spoke to Lara on her birthday at the end of June 2018, just before she died.

"I can't believe that's the last time I heard her voice," Talya said. "I don't know how to live without her. There's a hole in my heart now that will never be filled."

Talya said she would like justice for her sister's death and closure for the family, especially Lara's son. In June of 2023, Talya told Dateline, "Her only goal was to protect her child. She was kind, smart, dedicated, and courageous."

"Every day we have the horror and trauma of reliving this -- rethinking her final moments, and how her beautiful life could end in such a monstrous manner," Talya said. "It's beyond vile. Nobody deserves that."

Bradley Davis

Bradley Davis has been a producer for Dateline NBC and NBC News since 1999.  In that role, Bradley has produced a wide range of Dateline programs and stories focusing on crime and justice, breaking news, and entertainment.

Bradley has received multiple awards, including Emmy Awards as a producer on Dateline's "Miracle on the Hudson" and NBC News Election night coverage in 2008.  He also received an Emmy as part of the writing team for the NBC News Special "Inside the Obama White House" in 2009.

Bradley lives in New York City with his partner.

# EXHIBIT

# F



DoubleVerify

Our Platform    Get in touch    Log in

# Newsroom

← **PRESS RELEASES**

# DoubleVerify Announces CEO Transition

by Corporate

Posted on
February 28,

**NEW YORK – FEBRUARY 28, 2020 –**
DoubleVerify ("DV"), a leading software platform
for digital media measurement, data and

DoubleVerify uses cookies to improve your experience on our site and to
help us understand how our site is being used. By continuing to use our
website you are giving consent to cookies being used. For more
information on cookies and how you can disable them please visit our
Privacy Policy

√ Accept Cookies



Our Platform    Get in touch    Log in

in identifying a new CEO.

In the interim, the DV Board has established an Office of the CEO comprised of members of the Board and senior management to assume Mr. Gattinella's responsibilities until a permanent CEO is identified. The Office will be led by Lead Director Laura Desmond, who will serve as Interim CEO. Ms. Desmond is a marketing industry veteran who has held several senior executive positions at Publicis Groupe over a two-decade tenure at the company, including CEO of Starcom Mediavest Group, which was the largest media agency globally.

Ms. Desmond commented, "DoubleVerify is led by a deep bench of outstanding senior talent, and I look forward to working closely with them during this interim period to ensure the continued success of the business and a seamless leadership transition. DV has tremendous momentum, and we are all staying focused on

DoubleVerify uses cookies to improve your experience on our site and to help us understand how our site is being used. By continuing to use our website you are giving consent to cookies being used. For more information on cookies and how you can disable them please visit our Privacy Policy



Our Platform     Get in touch     Log in

"It has truly been an honor and privilege to lead the DoubleVerify team for the past eight years," said Mr. Gattinella. "I'm deeply grateful for the enormous talent and commitment of all DV employees and leave with the confidence that the company is in strong hands."

## About DoubleVerify

DoubleVerify is a leading software platform for digital media measurement, data and analytics. DV's mission is to be the definitive source of transparency and data-driven insights into the quality and effectiveness of digital advertising for the world's largest brands, publishers and digital ad platforms. DV's technology platform provides advertisers with consistent and unbiased data and analytics that can be used to optimize the quality and return on their digital ad investments. Since 2008, DV has helped hundreds of Fortune 500 companies gain the most from their media

DoubleVerify uses cookies to improve your experience on our site and to help us understand how our site is being used. By continuing to use our website you are giving consent to cookies being used. For more information on cookies and how you can disable them please visit our Privacy Policy



Our Platform    Get in touch    Log in

**BLOG** | March 13, 2020

# CTV & OTT: Not Always a TV-Like Experience

**REPORTS** | February 20, 2020

# OM SDK: Full Year 2019 Report

# Lets Talk!

Request a demo, speak to a sales

DoubleVerify uses cookies to improve your experience on our site and to help us understand how our site is being used. By continuing to use our website you are giving consent to cookies being used. For more information on cookies and how you can disable them please visit our Privacy Policy

DoubleVerify Announces CEO Transition | DoubleVerify



Our Platform     Get in touch     Log in

## Let's build a better industry. ®

f   🐦   in   G+

| Our Story | Newsroom | Privacy |
|---|---|---|
| Our Platform | Leadership | Contact Us |
| Our Company | Investors | Join Us |

Client log in

  

DoubleVerify uses cookies to improve your experience on our site and to help us understand how our site is being used. By continuing to use our website you are giving consent to cookies being used. For more information on cookies and how you can disable them please visit our Privacy Policy

# EXHIBIT

# G

 DoubleVerify

# DoubleVerify Names Mark Zagorski Chief Executive Officer

**New York, NY – July 2, 2020 –** DoubleVerify ("DV"), a leading software platform for digital media measurement, data and analytics, announced today that Mark Zagorski has been named Chief Executive Officer ("CEO") of the company, effective July 21st.

Zagorski is a seasoned executive with over two decades of successes in digital marketing and advertising technology – leading companies with a focus on CTV/OTT, data analytics and digital advertising optimization. Zagorski previously served as the CEO of Telaria (NYSE:TLRA), where he was instrumental in building the business into the leading video and CTV monetization platform for premium video publishers. This past year, he helped lead the company's successful merger with Rubicon Project (NASDAQ:RUBI), creating the world's largest independent sell-side advertising platform. Prior to joining Telaria in 2017, Zagorski was the CEO of eXelate, where he successfully led the sale of the company to Nielsen and subsequently assumed the role of Executive Vice President – launching and leading Nielsen's Marketing Cloud Division. During his tenure as CEO of eXelate, Zagorski expanded its global analytics footprint to include billions of consumer data points, and launched its market leading enterprise data platform.

Zagorski will be based out of DoubleVerify's New York office and will be responsible for managing and growing the company's worldwide operations, which include over 550 employees in 18 offices globally. As the business accelerates its efforts to become the global standard for measurement across all platforms, Zagorski's expertise and success in the CTV space will be at the forefront of this drive.

"Mark's wealth of leadership experience in the digital marketing space makes him an ideal fit to lead DV, and we are thrilled to welcome an executive of his caliber to the team," said Laura Desmond, DV's Interim CEO and Lead Director. "He is a strong cultural fit and has a proven track record of building and growing businesses globally. We are confident he will continue to drive DV's considerable momentum in the years ahead."

DV | DoubleVerify

and an outstanding market reputation. There is a huge opportunity to continue to grow the business, and I am energized and excited to leverage my experience in CTV, data and analytics to make this happen. I look forward to working with the talented DV team to further expand its offering of innovative solutions for advertisers and partners."

"Mark's industry expertise and experience with both public and private companies will be a tremendous asset to DV as it continues to execute on its growth strategy," added Davis Noell, Managing Director at Providence Equity and Chairman of the Board at DoubleVerify. "I'd also like to thank Laura Desmond for her leadership as Interim CEO and look forward to continuing to work with her on the Board. She and the entire DV team have done an incredible job pulling together and maintaining strong momentum despite the challenges created by the COVID-19 pandemic."

## Mark Zagorski Bio

Mark Zagorski has over 20 years of experience as a digital marketing leader. Most recently, Zagorski was the President and COO of Rubicon Project, the largest independent sell-side platform, which was the result of the successful merger of two publicly listed digital ad platforms, Rubicon Project (NASDAQ:RUBI) and Telaria (NYSE:TLRA). Before the merger, Zagorski was CEO of Telaria, where he was instrumental in building the business into the leading video and CTV monetization platform for premium partners like Hulu, Sling and PlutoTV. At Telaria, he also helped the company reach a record market cap and become EBITDA positive for the first time in the company's 10+ year history.

Previously, as CEO of eXelate, Zagorski expanded the company's global data footprint to over 5 billion consumer data points, grew its application ecosystem to include over 250 partners and launched its market-leading enterprise data platform. In March of 2015, Zagorski successfully led the sale of eXelate to the Nielsen Company, the global leader in measurement and analytics, where he became an EVP, launching and leading the Nielsen Marketing Cloud.

Zagorski has been at the forefront of digital disruption since 1997 when he joined Modem Media Poppe Tyson, a pioneering digital ad agency and birthplace of the first banner ad. Following his agency tenure working for clients like IBM, Priceline and Standard & Poor's, Zagorski was appointed President of WorldNow, which ushered over 300 TV stations into the digital age. He later helped newspapers evolve online as Chief Marketing Officer and Corporate EVP of MediaSpan, where he built its 1,400+ affiliate local network.



Adweek's MarTech Superstars.

## About DoubleVerify

DoubleVerify is a leading software platform for digital media measurement, data and analytics. DV's mission is to be the definitive source of transparency and data-driven insights into the quality and effectiveness of digital advertising for the world's largest brands, publishers and digital ad platforms. DV's technology platform provides advertisers with consistent and unbiased data and analytics that can be used to optimize the quality and return on digital ad investments. Since 2008, DV has helped hundreds of Fortune 500 companies gain the most from their media spend by delivering best in class solutions across the digital advertising ecosystem, helping to build a better industry. Learn more at www.doubleverify.com.

## About Providence Equity Partners

Providence is a premier global asset management firm with over $45 billion in aggregate capital commitments. Providence pioneered a sector-focused approach to private equity investing with the vision that a dedicated team of industry experts could build exceptional companies of enduring value. Since the firm's inception in 1989, Providence has invested in more than 200 companies and has become a leading equity investment firm focused on the media, communications, education and information industries. Providence is headquartered in Providence, RI, and also has offices in New York and London. For more information, please visit www.provequity.com.

Media Contacts:

DoubleVerify Chris Harihar Crenshaw Communications chris@crenshawcomm.com

Providence Equity Partners Andrew Cole / Kelsey Markovich Sard Verbinnen & Co. Prov-SVC@sardverb.com

Share

# EXHIBIT

# H

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, DC 20549

## FORM 8-K
### CURRENT REPORT
**Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): April 24, 2024**

# Outbrain Inc.
(Exact name of registrant as specified in its charter)

| Delaware | 001-40643 | 20-5391629 |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

**111 West 19th Street**
**New York, NY 10011**
(Address of principal executive offices, including zip code)

(Registrant's telephone number, including area code): **(646) 867-0149**

**N/A**
(Former name or former address, if changed since last report)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instruction A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common stock, par value $0.001 per share | OB | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§ 230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§ 240.12b-2 of this chapter).

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 5.02. Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**

*Appointment of New Director.*

Effective April 25, 2024, Mark S. Zagorski joined the Board of Directors (the "Board") of Outbrain Inc. (the "Company"). Mr. Zagorski will serve as a Class I director with a term expiring at the Company's 2025 Annual Meeting of Stockholders. Mr. Zagorski has been appointed to serve as a member of the Nominating and Corporate Governance Committee.

Mr. Zagorski has served as Chief Executive Officer and director of DoubleVerify Holdings, Inc., a leading software platform for digital media measurement, data and analytics, since July 2020. Prior to that, Mr. Zagorski served as Chief Executive Officer of Telaria (NYSE: TLRA) from July 2017 to April 2020 and, following Telaria's merger with Rubicon Project, served as President and Chief Operating Officer for Rubicon Project (now Magnite, Inc.) (Nasdaq: MGNI) through June 2020. Prior to that, Mr. Zagorski was Chief Executive Officer of eXelate from December 2010 until its acquisition by the Nielsen Company in March 2015, and continued to manage the eXelate business as Executive Vice President of Nielsen Marketing Cloud through June 2017. Mr. Zagorski has over 20 years of digital advertising leadership experience and held previous management positions in companies including MediaSpan, WorldNow and Modem Media. Mr. Zagorski received a M.B.A. from the University of Rochester's Simon School of Business and a B.S. in Finance from Gannon University, where he also received an Honorary Doctorate of Humane Letters.

The Board has determined that Mr. Zagorski is independent under the rules of The Nasdaq Stock Market LLC ("Nasdaq"). Mr. Zagorski's compensation will be consistent with that of other non-employee directors paid by the Company to its non-employee directors as generally described under "Director Compensation" in the Company's proxy statement filed with the U.S. Securities and Exchange Commission ("SEC") dated April 27, 2023. There are no arrangements or understandings between Mr. Zagorski and any other person pursuant to which he was selected as a director, and there are no transactions related to the Company in which Mr. Zagorski has an interest requiring disclosure under Item 404(a) of Regulation S-K. Additionally, in connection with his appointment, Mr. Zagorski has entered into a standard indemnification agreement with the Company in the form previously approved by the Board, which is filed as Exhibit 10.1 to the Company's Form S-1, as amended, filed with the SEC on June 29, 2021 and is incorporated by reference herein.

*Resignation of a Director.* On April 24, 2024, Jonathan Cheifetz, a member of the Board, informed the Company that he would resign as a Class I director effective as of April 25, 2024. Mr. Cheifetz's decision to resign was not the result of any disagreement with the Company. The Company sincerely thanks Mr. Cheifetz for his years of distinguished service on the Board.

Arne Wolter has been appointed to the Audit Committee to fill the vacancy created by Mr. Cheifetz's departure.

2

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the Company has duly caused this report on Form 8-K to be signed on its behalf by the undersigned hereunto duly authorized.

**OUTBRAIN INC.**

Date: April 25, 2024

By: /s/ David Kostman
Name: David Kostman
Title: Co-Chief Executive Officer

3

# EXHIBIT

I

3/31/25, 12:53 PM                    Moguldom Media Group Mail - Sworn Affidavit Nubai Ventures Inc. vs Outbrain Inc.

Case 1:25-cv-02715-LJL    Document 1-1    Filed 03/31/25    Page 35 of 66

# MOGULDOM

Jamarlin Martin <jmartin@moguldom.com>

## Sworn Affidavit Nubai Ventures Inc. vs Outbrain Inc.

**Jamarlin Martin** <jmartin@moguldom.com>                                    Fri, May 17, 2024 at 6:30 PM
To: "David M. Pohl" <david.pohl@parkerpohl.com>, yenisey@rodriguezmccloskey.com
Cc: katelyn@rodriguezmccloskey.com

Yenisey and David,

I have been in contact with the clerk for the Honorable Mary V. Rosado. In light of my extraordinary circumstances, the clerk under judge Rosado has given me permission to file the attached affidavit directly with the court.

As far as I'm concerned, my legal interests are independent of both of you. Therefore, you both can get the same information and affidavit, within the same email, at the same time.

Attached, you will find the sworn affidavit and exhibits I am filing with the court. For transparency, I am sending courtesy copies to both of you via this email.

Following the court's instructions, a process server is scheduled to deliver the official copies to you on Monday followed by a courtesy copy to the clerk.

Best Regards

JM

--
**Jamarlin Martin**
Founder and CEO
Nubai Ventures Inc.
Moguldom.com

📄 **AFFSCANOB517.pdf**
1327K

**SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY**

NUBAI VENTURES INC.

*Plaintiff(s)*

vs

OUTBRAIN, INC.

*Defendant(s)*

COURT DATE & TIME: AT
INDEX #: 152157/2024
DATE FILED:
JOB #: 63383
CLIENT FILE#

CLIENT'S FILE NO.:

**AFFIDAVIT OF DUE-DILIGENCE**

AUTUMN GLENN, being duly sworn, deposes and says: that deponent is not a party to this action, is over 18 years of age and resides in the State of New York.

That on **05/22/2024** at **10:03 AM.**, at **32 COURT STREET, SUITE 2101, BROOKLYN, NY 11201**
Deponent attempted to serve the within **AFFIDAVIT IN SUPPORT, EXHIBITS**
On **RODRIGUEZ-MCCLOSKEY PLLC**

That diligent effort was made by deponent to serve the within document(s) on the defendant(s)/respondent therein named without success for the reasons indicated below:

**Attempts**

05/20/2024 16:21:00 32 COURT STREET, SUITE 2101, BROOKLYN, NY 11201 AS PER SECURITY I NEED TO CALL UPSTAIRS FIRST TO GAIN ACCESS TO THEIR OFFICE. I CALLED UPSTAIRS AND NO ONE ANSWER THE OFFICE PHONE.

05/21/2024 14:04:00 32 COURT STREET, SUITE 2101, BROOKLYN, NY 11201 AS PER SECURITY I NEED TO CONTACT SOMEONE IN THE OFFICE FIRST. THERE WAS NO ANSWER TO THEIR OFFICE PHONE.

05/22/2024 10:03 AM 32 COURT STREET, SUITE 2101, BROOKLYN, NY 11201 AS PER CONCIERGE, MUST HAVE A CONTACT NUMBER TO SERVE. DEPONENT TRIED SEVERAL NUMBERS FOR COMPANY AND WAS ROUTED TO VOICEMAIL EACH TIME.

**Comments**

Sworn to before me on 05/24/2024

TAMARA TOWSHIN ALAM
NOTARY PUBLIC, STATE OF NEW YORK
REGISTRATION NO. 01AL6369961
QUALIFIED IN KINGS COUNTY
COMMISSION EXPIRES JANUARY 22, 2026

AUTUMN GLENN
2110676-DCA

**SUPREME COURT OF THE STATE OF NEW YORK NEW YORK COUNTY**

NUBAI VENTURES INC.

*Plaintiff(s)*

vs

*Defendant(s)*

OUTBRAIN, INC.

COURT DATE & TIME: AT
INDEX #: 152157/2024
DATE FILED:
JOB #: 63392
CLIENT FILE#

CLIENT'S FILE NO.:

**AFFIDAVIT OF DUE-DILIGENCE**

AUTUMN GLENN, being duly sworn, deposes and says: that deponent is not a party to this action, is over 18 years of age and resides in the State of New York.

That on **05/23/2024** at **10:53 AM.**, at **99 PARK AVENUE, SUITE 1510, NEW YORK, NY 10016**
Deponent attempted to serve the within **AFFIDAVIT IN SUPPORT, EXHIBITS**
On **PARKER POHL LLP**

That diligent effort was made by deponent to serve the within document(s) on the defendant(s)/respondent therein named without success for the reasons indicated below:

**Attempts**
05/21/2024 16:59:00 99 PARK AVENUE, SUITE 1510, NEW YORK, NY 10016 AS PER SECURITY I NEED TO CALL UPSTAIRS FIRST IN ORDER TO GAIN ACCESS.
05/22/2024 11:36 AM 99 PARK AVENUE, SUITE 1510, NEW YORK, NY 10016 AS PER CONCIERGE, MUST HAVE A CONTACT NUMBER TO SERVE. DEPONENT TRIED SEVERAL NUMBERS FOR COMPANY AND WAS ROUTED TO VOICEMAIL EACH TIME.
05/23/2024 10:53 AM 99 PARK AVENUE, SUITE 1510, NEW YORK, NY 10016 CONCIERGE SAYS THAT YOU MUST HAVE A CONTACT NUMBER TO SERVE. THE DEPONENTTRIED MULTIPLE NUMBERS FOR THE COMPANY AND WAS DIRECTED TO VOICEMAIL EACH TIME.

**Comments**

Sworn to before me on 05/24/2024

TAMARA TOWSHIN ALAM
NOTARY PUBLIC, STATE OF NEW YORK
REGISTRATION NO. 01AL6369961
QUALIFIED IN KINGS COUNTY
COMMISSION EXPIRES JANUARY 22, 2026

AUTUMN GLENN
2110676-DCA

*SLS PROCESS SERVING COMPANY, LLC, 90 STATE STREET, ALBANY, NY 12207*

# EXHIBIT

# J

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF NEW YORK

---------------------------------------------------------------------- X

NUBAI VENTURES INC., Index No.: 152157/2024

Plaintiff,

-against- AFFIDAVIT IN SUPPORT

OUTBRAIN, INC.,

Defendants.

---------------------------------------------------------------------- X

**(i) Conflict Confirmed**

On April 29, 2024, the plaintiff's former attorney in a non-related matter, Harold Levy, confirmed that the defendant's counsel, Yenisey Rodriguez-McCloskey, had previously considered representing the plaintiff, Nubai, in the RICO matter in the Southern District of New York as co-counsel, alongside three defendants. Harold Levy stated, "I believe Yenisey was the one with the conflict." (EXHIBIT A)

**(ii) Prior Relationship with Individual RICO Defendant in Southern District of New York**

On December 11, 2023, while the RICO matter was active in the Southern District of New York (Dale E. Ho), Harold Levy informed the plaintiff, stating, "I spoke with my attorney contact, and apparently she represented someone on the other side. (EXHIBIT B) While it is not a direct conflict, she feels that due to her relationship, she should not get involved."

1

This attorney was Yenisey Rodriguez-McCloskey, who, despite being aware of the potential conflict and having received privileged information from Harold Levy—a personal friend—chose to represent Outbrain Inc. The plaintiff affirms that there was a failure to disclose this conflict to the plaintiff by the defendant, defendant's counsel, or Harold Levy.

There were three RICO defendants in the Southern District of New York, Outbrain Inc., David Kostman, and Yaron Golai.

**(iii)American Bar Association**

According to Rule 1.18(c) of the American Bar Association: "A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d)." (EXHIBIT C)

The plaintiff understands that Yenisey Rodriguez-McCloskey maintains a personal or professional relationship with Yaron Golai, Chairman of the Board of Directors, or David Kostman, CEO of the defendant, Outbrain Inc., both of whom were named individually in the RICO matter in the Southern District of New York.

**(iv) Extreme Statistical Deviation from American Corporate Governance Convention and Potential For Fraudulent Orientation**

The plaintiff is currently investigating whether this strategic decision, which substantially deviates from American corporate governance norms, was made to gain an undue advantage in the litigation process.

Out of the hundreds of law firms experienced in representing public companies with annual revenues approaching $1 billion, defendant Outbrain Inc. chose to engage an attorney who lacks experience in advertising, media, cybersecurity, technology, and RICO matters and selective an attorney who received inside information on Plaintiff's case and circumstances after the harm from fraudulent bots to Nubai Ventures Inc.

The plaintiff, a small business, has alleged fraud, yet the defendant appears unable to initiate its legal defense without adopting a potentially fraudulent orientation and seeking an unethical advantage. Additionally, the plaintiff believes the defendant has attempted to obstruct justice and frustrate the plaintiff's right to a fair legal process without taint, conflicts, and compromise. The plaintiff seeks the court to consider the material context of RICO and Fraud claims when considering the defendant's strategic choice of counsel.

Plaintiff respectfully requests the court to consider the significant conflict of interest and the potential ethical violations in this matter, and to urgently take appropriate action to ensure a fair and just legal process. Plaintiff respectfully requested the court to consider if delay relating to addressing conflict and potential obstruction of justice could further advantage the defendant.

Sincerely,

Jamarlin Martin, Founder and CEO of Nubai Ventures Inc.

State of _Florida_

County of _Broward_

Subscribed and sworn to (or affirmed) before me on this _17th_ day of _May_ , 20_24_ by _Jamarlin Martin_ , proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

_____
Notary Signature

JOYCE JAN ALBERTO
Notary Public, State of Florida
Commission# HH 273490
My comm. expires June 18, 2026

4

MOGULDOM                                                    Jamarlin Martin <jmartin@moguldom.com>

## Old Client from 2013, New Federal Lawsuit Claim

Harold Levy <harold@hllawgroup.com>                                    Mon, Apr 29, 2024 at 12:16 PM
To: Jamarlin Martin <jmartin@moguldom.com>

Hey JM.  I didn't miss it.

I believe Yenisey was the one with the conflict although I reached out to a number of attorneys after we spoke.

**Harold Y. Levy, Esq.**

Founding Partner & President

**HL LAW GROUP**

**FLORIDA OFFICE**
2901 East Oakland Park Boulevard, Suite 503
Fort Lauderdale, Florida 33306
Office: (954) 713-1212
Fax: (954) 760-4239

**NEW YORK OFFICE**
1412 Broadway, 12th floor

New York, NY 10010
Office: (212) 684-4000.

For more information regarding HL Law Group, P.A., please visit the Firm's Website at: www.HLLawGroup.com.

CONFIDENTIALITY NOTICE: This e-mail message and attachments hereto may contain legally privileged and confidential information intended for the exclusive use of the addressee. If you are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or distribution of this information may be subject to legal restriction or sanction. Please notify the sender, by e-mail or telephone, and delete the original message from your computer.

**From:** Jamarlin Martin <jmartin@moguldom.com>
**Sent:** Monday, April 29, 2024 12:14 PM
**To:** Harold Levy <harold@hllawgroup.com>
**Subject:** Fwd: Old Client from 2013, New Federal Lawsuit Claim

Want to make sure you didn't miss this. It's urgent I know.

JM

---------- Forwarded message ---------
From: Jamarlin Martin <jmartin@moguldom.com>
Date: Mon, Apr 29, 2024 at 8:45 AM
Subject: Re: Old Client from 2013, New Federal Lawsuit Claim
To: Harold Levy <harold@hllawgroup.com>

Good Morning Harold,

MOGULDOM                                      Jamarlin Martin <jmartin@moguldom.com>

## Old Client from 2013, New Federal Lawsuit Claim

Harold Levy <harold@hllawgroup.com>                      Mon, Dec 11, 2023 at 9:56 AM
To: Jamarlin Martin <jmartin@moguldom.com>

Thanks JM, I am en transit to FL but will review asap when back in office.  On another note, I spoke with my attorney contact and apparently she represented someone on the other side so while it is not a direct conflict she feels that due to her relationship she should not get involved.  She referred me to 2 of her colleagues and said they would reach out if they are able to assist. My only concern at this juncture is my ability to file an appearance on Thurs without having local NYC counsel in place.


Harold Y. Levy, Esq.
HL Law Group, P.A.


On Dec 11, 2023, at 9:33 AM, Jamarlin Martin <jmartin@moguldom.com> wrote:


[Quoted text hidden]
[Quoted text hidden]
 [Quoted text hidden]

 [Quoted text hidden]
  [Quoted text hidden]

  [Quoted text hidden]
   [Quoted text hidden]
   <image001.jpg>
   [Quoted text hidden]
   [Quoted text hidden]
[Quoted text hidden]
<2022-2023 Media Policy (1).pdf>
<2023-2024 BOP Policy - Nubai Ventures.pdf>
<2022-2023 Cyber Policy Stamped (1).pdf>




**Image001.jpg**
6K

# Rule 1.18:

Share:



## Duties To Prospective Client

(a) A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.

(b) Even when no client-lawyer relationship ensues, a lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation, except as Rule 1.9 would permit with respect to information of a former client.

(c) A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d). If a lawyer is disqualified from representation under this paragraph, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d).

(d) When the lawyer has received disqualifying information as defined in paragraph (c), representation is permissible if:

(1) both the affected client and the prospective client have given informed consent, confirmed in writing, or:

(2) the lawyer who received the information took reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary to determine whether to represent the prospective client; and

(f) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and
(ii) written notice is promptly given to the prospective client.

**Comment**

[1] Prospective clients, like clients, may disclose information to a lawyer, place documents or other property in the lawyer's custody, or rely on the lawyer's advice. A lawyer's discussions with a prospective client usually are limited in time and depth and leave both the prospective client and the lawyer free (and sometimes required) to proceed no further. Hence, prospective clients should receive some but not all of the protection afforded clients.

[2] Not all persons who communicate information to a lawyer are entitled to protection under this Rule. A person who communicates information unilaterally to a lawyer, without any reasonable expectation that the lawyer is willing to discuss the possibility of forming a client-lawyer relationship, is not a "prospective client" within the meaning of paragraph (a).

[3] It is often necessary for a prospective client to reveal information to the lawyer during an initial consultation prior to the decision about formation of a client-lawyer relationship. The lawyer often must learn such information to determine whether there is a conflict of interest with an existing client and whether the matter is one that the lawyer is willing to undertake. Paragraph (b) prohibits the lawyer from using or revealing that information, except as permitted by Rule 1.9, even if the client or lawyer decides not to proceed with the representation. The duty exists regardless of how brief the initial conference may be.

[4] In order to avoid acquiring disqualifying information from a prospective client, a lawyer considering whether or not to undertake a new matter should limit the initial interview to only such information as reasonably appears necessary for that purpose. Where the information indicates that a conflict of interest or other reason for non-representation exists, the lawyer should so inform the prospective client or decline the representation. If the prospective

client wishes to retain the lawyer, and if consent is possible under Rule 1.7, then consent from all affected present or former clients must be obtained before accepting the representation.

[5] A lawyer may condition conversations with a prospective client on the person's informed consent that no information disclosed during the consultation will prohibit the lawyer from representing a different client in the matter. See Rule 1.0(e) for the definition of informed consent. If the agreement expressly so provides, the prospective client may also consent to the lawyer's subsequent use of information received from the prospective client.

[6] Even in the absence of an agreement, under paragraph (c), the lawyer is not prohibited from representing a client with interests adverse to those of the prospective client in the same or a substantially related matter unless the lawyer has received from the prospective client information that could be significantly harmful if used in the matter.

[7] Under paragraph (c), the prohibition in this Rule is imputed to other lawyers as provided in Rule 1.10, but, under paragraph (d)(1), imputation may be avoided if the lawyer obtains the informed consent, confirmed in writing, of both the prospective and affected clients. In the alternative, imputation may be avoided if the conditions of paragraph (d)(2) are met and all disqualified lawyers are timely screened and written notice is promptly given to the prospective client. See Rule 1.0(k) (requirements for screening procedures). Paragraph (d)(2)(i) does not prohibit the screened lawyer from receiving a salary or partnership share established by prior independent agreement, but that lawyer may not receive compensation directly related to the matter in which the lawyer is disqualified.

[8] Notice, including a general description of the subject matter about which the lawyer was consulted, and of the screening procedures employed, generally should be given as soon as practicable after the need for screening becomes apparent.

[9] For the duty of competence of a lawyer who gives assistance on the merits of a matter to a prospective client, see Rule 1.1. For a lawyer's duties when a prospective client entrusts valuables or papers to the lawyer's care, see Rule 1.15.

# EXHIBIT

# K

**The Moguldom Nation**    POLITICS    AI    KOS    REPARATIONS    MARKETS    TECH    PERSONAL FINANCE    MORE    Q    SI





AD

Explore



10 Things To Know About Legendary Natural Healer Dr. Sebi



AD

# Open Letter # 2 to Outbrain Inc's (Nasdaq: OB) Board of Directors: 'Unlucky' and the Bot Fraud Lawsuit

 Written by Jamarlin Martin
May 03, 2024

 SUBSCRIBE   77 SHARES   f   X

  

   

As the founder of Nubai Ventures, a small business, and unconventional whistleblower, I am calling for an independent and unbiased investigation into Outbrain Inc.'s hiring practices regarding its legal defense. We are primarily concerned with



Outbrain has pursued information and strategic advantages over Nubai.

The Board should carefully review the hiring of Yenisey Rodriguez-McCloskey within the context of the initial RICO lawsuit with three different defendants and, later, our fraud lawsuit.



Remembering Legendary Black Adventism Pastor CD Brooks Who Passed Away at 85: 13 Things To Know



The 3 Health Issues That Led To The Death Of Legendary Singer Luther Vandross At Age 54



Fact Check: Is There a Black Secret Society Of Elites Called The Boulé?

Outbrain Inc., consistent with its pattern of seemingly fraudulent orientation, started its defense with an expression of fraudulent orientation.

On April 29, 2024, it became clear that Yenisey Rodriguez-McCloskey, who represents Outbrain Inc. in our fraud case, was initially approached to represent our interests of Nubai as co-counsel on December 11, 2023.

She then flipped to Outbrain Inc.

During this engagement, she obtained privileged information about Nubai's legal strategy and financial situation. Subsequently, she opportunistically chose to represent Outbrain and the individual Co-CEOs in a complex federal

AD

withdrawal.) This raises severe questions about the fairness and impartiality of her representation and whether Nubai was disadvantaged and obstructed from justice. This ethical orientation by Outbrain and a potential co-conspirator could give rise to additional claims on top of our current New York Supreme Court claims.

## The Moguldom Nation Newsletter

Independent News for Black America, Get Ahead of The Curve

Enter your email                    Subscribe

beehiiv



**Yenisey Rodriguez-McCloskey, Esq.**
Founding Partner

LOCATION    Brooklyn, New York
PHONE       (718) 841-9491
EMAIL       Click To Email

Her prior work for one of the individual RICO defendants disclosed only through conversations with my former legal counsel, exacerbates the conflict. Given the complexity of our case and the potential for significant harm from such disputes, the selection of Ms. Rodriguez-McCloskey and her firm appears not just as a mere oversight but as a strategic advantage sought by Outbrain.

AD



gain an advantage over a small business plaintiff, cut corners, and load up institutional shareholders with risks?

**American Bar Association's Stance**

According to Rule 1.18(c) of the American Bar Association: "A lawyer subject to paragraph (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d)."

This rule underscores the inappropriateness of Ms. Rodriguez-McCloskey's role in this litigation, given her prior interactions with former counsel of Nubai Ventures. Given her known conflicts, the choice of Ms. Rodriguez-McCloskey out of the myriad available legal professionals in New York is deeply troubling.

**Call for an Independent Review**

I urge Outbrain's Board to initiate an independent review of this matter by a genuinely unaffiliated third party. This investigation should assess the ethical breaches involved and evaluate the processes by which legal representation was chosen, ensuring such decisions are free from personal biases and conflicts.

AD

Nubai Ventures remains committed to a transparent and fair legal process. We seek to engage through an independent



concerns are handled with the integrity they warrant. It is crucial for the confidence of all parties involved, including Outbrain's shareholders and the broader market, to address this issue promptly and thoroughly.

**Concerns Over Legal Representation and Governance at Outbrain Inc.**

The decision by Outbrain Inc. to engage Rodriguez-McCloskey for its defense raises serious concerns reminiscent of the infamous Madoff scandal, where disproportionate professional services were utilized to mask deeper issues within the organization. This analogy is pertinent as Outbrain, a company with nearly $1 billion in annual revenue, opted for a small-scale legal firm that needs to be equipped for the complexities and scale of a RICO case involving primary corporate and individual interests.

**Inappropriate Gain of Information Advantage**

It is troubling to consider why a corporation of Outbrain's stature would need to secure an information advantage against Nubai Ventures, a considerably smaller entity. This strategy indicates a more profound, systemic problem within Outbrain's legal defense and corporate governance approach. By choosing an attorney with prior personal ties to a RICO defendant, Outbrain potentially prioritized individual over corporate interests, creating a conflict with the broader interests of its shareholders.

**Implications for Corporate Governance**

Rodriguez-McCloskey's engagement, given her past involvement with one of the individual RICO defendants, poses a direct conflict of interest. This conflict could undermine the impartiality required of legal counsel

AD

aligning it more with personal defense rather than corporate, especially in the context of the initial severe allegations under a RICO claim, then fraud in New York Supreme Court. The pattern of corporate conduct strongly suggest McCloskey was not only brought in to gain advantage over Nubai, possessing privileged information, but also to protect individual interests, over Outbrain the corporation.

**Call for Board Action and Oversight**

Outbrain's Board of directors must address this critical issue to restore faith in the company's ethical standards and legal practices. If Ms. Rodriguez-McCloskey continues to represent Outbrain, it may suggest a board-level endorsement of practices that could be construed as conspiratorial or as obstructions of justice. The Board's failure to act decisively could be perceived as complicity in these questionable legal strategies, thereby damaging Outbrain's reputation and shareholder trust irreparably.

The title of the Board Letter is "unlucky."

Here are the five risk factors why Outbrain was unlucky when an extreme level of fraudulent bots severely damaged my business.

**1. Depth of Experience in Digital Advertising and Analytics**

Throughout my career and involving expenditures of over **$15 million** with Outbrain, I have cultivated extensive knowledge in digital advertising and arbitrage techniques. This depth of experience has equipped me to manage and optimize advertising strategies effectively and endowed me with a keen eye for identifying discrepancies and unethical practices within digital traffic flows. When Outbrain's fake clicks and bots adversely harmed Nubai, it also introduced a "skin-in-the-game" to investigate the matter for over 14 months. The "skin-in-the-game" factor turned me into a bot fraud

AD

3/31/25, 3:52 PM                    Open Letter # 2 to Outbrain Inc's (Nasdaq - OB) Board of Directors- 'Unlucky' and the Bot Fraud Lawsuit

Case 1:25-cv-02715-LJL    Document 1-1    Filed 03/31/25    Page 56 of 66



**2. Jack Grubman and Lessons on Conflicts of Interest**

My foundational experience as a contract paralegal at Paul,
Weiss, Rifkind, Wharton & Garrison LLP exposed me to the
complexities of high-stakes legal disputes, notably the case
involving star Wall Street analyst Jack Grubman. This
exposure was particularly enlightening, providing me
firsthand insights into the internal mechanisms of conflict of
interest and its repercussions in the corporate world.
Analyzing Grubman's communications deepened my
understanding of the subtleties of corporate misconduct and
the importance of maintaining ethical integrity within
professional practices. This experience has been
instrumental in framing my approach to handling the
challenges posed by Outbrain's management of its
advertising network and its decision-making in legal
defenses.



**3. McKinsey & Company**

After graduating from Morehouse College, I was hired as a



Open Letter # 2 to Outbrain Inc's (Nasdaq: OB) Board of Directors: Unlucky' and the Bot Fraud Lawsuit

understand how the image of the then "Pope of Corporate America," Rajat Gupta, was the same person calling his hedge fund friends after a Goldman Sachs board meeting with insider information. The elite pedigree can prevent us from seeing the potential for nefarious corporate or even criminal behavior. My experience at McKinsey and later closely following the firm is relevant to our Outbrain case as things look so polished in the front, but there can be nefarious activity in the back.

AD

AD

### 4. Alameda, FTX, and Dan Friedberg

In closely following the evolving crypto landscape, the conflict of interest between Alameda, a leading proprietary trading firm, and FTX, a brokerage, was predictive of fraud. There is often increased temptation to commit fraud when there is a promiscuous amount of conflicts. On August 2, 2021, a story I commissioned and directed was <u>published</u> on Moguldom.com: *The Most Influential Trader In Crypto, Sam Trabucco, Works With FTX Exchange; Some See Manipulation.*

article on Sam Trubucco



Dan Friedberg <dfriedberg@alameda-research.com>
to state

Dear Mr. Martin

I saw your article on Sam and noticed a few things that are not really accurate.
Could we possibly have a call to discuss?
I understand your concerns about the industry but was hoping to explain further.
I'd greatly appreciate the opportunity to talk to you.

--
Best regards,
**Dan** Friedberg
General Counsel
Alameda Research LLC
xxx-xxx-xxxx

The lawyer for Alameda and FTX (conflict), Dan Friedberg, emailed me directly. There was no reason for me to talk to Dan Friedberg. I didn't care if regulators, Harvard MBAs, lawyers, and financial institutions couldn't see issues with this blatant and criminally predictive conflict. I saw enough risk factors to estimate an elevated risk of manipulation and fraud. I didn't care about Fortune and Forbes magazine covers; I kept my factors scientific and formed my estimates accordingly. I didn't care if no one in the world saw what I saw; I was strong enough to take a position years before the case made history in the United States.

AD

3/31/25, 3:52 PM

Case 1:25-cv-02715-LJL    Document 1-1    Filed 03/31/25    Page 60 of 66
Open Letter #2 to Outbrain Inc's (Nasdaq: OB) Board of Directors: 'Unlucky' and the Bot Fraud Lawsuit

# FTX Sues Ex-Compliance Chief Over 'Hush Money' Payments

**Daniel Friedberg allegedly helped hold together a "house of cards" at the behest of FTX insiders.**

By André Beganski

🕐 Jun 28, 2023
🕐 4 min read



A statue outside a Manhattan courthouse. Photo: André Beganski/Decrypt

## 5. Underestimation as Inefficiency

I am a Black American with roots deeply embedded in the history of Mississippi and Louisiana—lineages that trace back to the era of slave plantations. On the surface, Outbrain's lack of response and the opportunistic and unethical choice of their current counsel might imply that I was seen as a formidable opponent, not underestimated. Yet, underestimation and accurately assessing risks often coexist subtly. Within the dynamics of risk assessment, there are nuances—places where underestimation hides, even when facing perceived threats.

AD

AD

Outbrain found itself unfortunate, for it collided with perhaps the one American uniquely equipped to unravel and expose the underlying truths. My heritage and experience primed me to detect the discrepancies and connect the dots that others might overlook. It would take someone strong, independent, and confident enough to disagree with everybody.

Outbrain Inc. has become unlucky.

The KPMG auditors and the Wall Street analysts at JMP Securities, Citi, or Needham could never figure this out. I hope this is the Jack Grubman moment for American regulators to start tackling the $143 billion global ad fraud industry.

A potentially helpful framing : "a click-based" Nasdaq without SEC, insider trading, conflict-guard rails."

This $1 billion dollar click-based Nasdaq generates 70% of its revenue from outside United States legal jurisdiction, with a "trust me" Black Box, and with most of the partners masking their identities and ownership.

AD

3/31/25, 3:52 PM
Case 1:25-cv-02715-LJL   Document 1-1   Filed 03/31/25   Page 63 of 66
Open Letter #2 to Outbrain Inc's (Nasdaq: OB) Board of Directors' 'Unlucky' and the Bot Fraud Lawsuit

AD

3/31/25, 3:52 PM

Case 1:25-cv-02715-LJL   Document 1-1   Filed 03/31/25   Page 64 of 66
Open Letter # 2 to Outbrain Inc's (Nasdaq: OB) Board of Directors 'Unlucky' and the Bot Fraud Lawsuit

Finally, while the recent Board resignation and replacement with the CEO of Double Verify may seem like a quick fix, the Outbrain Board can't fix promiscuous conflicts with more conflicts. The Jack Grubman case highlights the dangers of mixing investment research with investment banking. The Outbrain Board should self-regulate unique industry-specific conflicts while regulators catch up.

I formally request the Independent Directors establish an intermediary for constructive evidence sharing that is not conflicted with CEO David Kostman, recently resigned co-CEO and founder Yaron Galai, General Counsel Veronica Gonzalez, Head of Legal Affairs Alexia Rosenberg, and Yenisey Rodriguez-McCloskey. I am not only a plaintiff, I am also an unconventional whistleblower.

We have urgent scientific-based evidence that the Board should see now. If the Board allows Rodriguez-McCloskey to stay on this fraud case, it is complicit in facilitating a potential conspiracy, against Nubai.

For observers watching this David vs Goliath fight closely, Nubai Ventures is establishing a legal fund to help take Outbrain to trial for fraud, with substantial punitive damages.

If you are interested in helping us join this fight, you can email us at data at Moguldom.com.

You can read more about our potentially historic lawsuit here.

Our first letter to Outbrain's Board is here:

AD

Jamarlin Martin

Founder and CEO, Nubai Ventures

*Freedom, Justice, and Equality*

[Open Letter To Outbrain (Nasdaq: OB) Board Members Kate Jhaveri and Nithya B. Das Regarding Systemic Bot Fraud Lawsuit](#)

APRIL 16, 2024



---

[Taboola And Outbrain End Talks To Merge Almost A Year After Announcing Deal](#)

SEPTEMBER 09, 2020



---

[US Government Goes After Startup CEO For Fraud For Fooling Investors With Inflated Revenue](#)

AUGUST 26, 2021



---

[Nigerian Tech Executive Busted By SEC Over Fake Accounting, Short Seller Research Pointed Feds To Target](#)

DECEMBER 26, 2023



---



[Alphabet's Top Lawyer To Retire Following Questions On Conduct](#)

JANUARY 10, 2020



---

[7 Lawyers Caught Ridin' Dirty And Busted By Feds](#)

MAY 27, 2024



## EXPLORE MOGULDOM

---

[Coach Deion Sanders Lands $54 Million Colorado Contract Extension: 5 Things To Know](#)

MARCH 28, 2025



 AD

---

[10 Best Sites to Buy Instagram Followers That Engage (2025)](#)

JANUARY 04, 2025





### Fact Check: The U.S. Military Is Using 'Barracks Bunny' Sexualized Influencer Recruiting Strategy and Psyops

JANUARY 24, 2023



### Bond King Jeffrey Gundlach And Deutsche Bank: The Probability Of Recession Is Approaching 50%

MARCH 25, 2025



### Remembering Singer And Actress Vanity Who Became Pastor Denise Matthews

JANUARY 12, 2024



### How Tech Is Giving People Addresses In Africa

FEBRUARY 22, 2019



Powered by

## The Moguldom Nation Newsletter

Independent News for Black America, Get Ahead of The Curve

Enter your email                    Subscribe

beehiiv

77 SHARES    f    X

AD

## The Moguldom Nation

© 2025 The Moguldom Nation, All Rights Reserved.

